Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
sbostrom@trustees.org
bbrisson@trustees.org
vbrown@trustees.org

*Attorneys for Plaintiffs*

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA WILDERNESS LEAGUE, DEFENDERS OF WILDLIFE, THE SIERRA CLUB, and THE WILDERNESS SOCIETY,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, RYAN ZINKE, in his official capacity as Secretary of the Interior, and BRIAN STEED, in his official capacity as the official exercising the authority of the Director of the Bureau of Land Management,<br><br>        Defendants,<br><br>    and<br><br>CONOCOPHILLIPS ALASKA, INC.,<br><br>        Intervenor-Defendant. | Case No. 3:18-cv-00030-SLG<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** (Administrative Procedure Act, 5 U.S.C. §§ 702–706; National Environmental Policy Act, 42 U.S.C. § 4332; Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508) |

Plaintiffs Northern Alaska Environmental Center, Alaska Wilderness League, Defenders of Wildlife, the Sierra Club, and The Wilderness Society (collectively, NAEC) file this Complaint for Declaratory and Injunctive Relief, and hereby allege:

## I. NATURE OF THE CASE

1. This action seeks declaratory and injunctive relief against the United States Department of the Interior and Bureau of Land Management (collectively, BLM) for failing to analyze the environmental effects of the 2017 decision to lease lands in the National Petroleum Reserve–Alaska (Reserve). This action arises under, and alleges violation of, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370h, the Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508, and their implementing regulations.

2. On December 6, 2017, the Bureau of Land Management conducted a lease sale where it offered 900 tracts, covering approximately 10.3 million acres — the largest number of tracts ever offered in a lease sale in the Reserve. When issuing the leases, BLM did not retain the authority to prohibit future activities on those leases. Despite this, BLM failed to prepare either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS) to thoroughly analyze the significant and foreseeable effects of oil and gas development that could result from the sale of the leases.

3. NAEC brings this challenge to overturn BLM's illegal lease sale and to ensure BLM considers impacts of the 2017 lease sale on important wildlife, habitat, and other resources in the Reserve, as required under NEPA.

4. NAEC seeks vacatur, declaratory, and injunctive relief because BLM's decision is arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG    Page 2 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 2 of 19

relief), and 2202 (injunctive relief). NAEC has a right to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

6. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State Office and because the leased lands at issue in the case are located in Alaska.

## III. PARTIES

### Plaintiffs

7. Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with over 900 members, sixty percent of whom are located throughout Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy. One of the Northern Center's major focus areas is its Arctic program. The Northern Center actively works to protect the Arctic, its communities, and vital wildlife habitats and wildlands, including areas like Teshekpuk Lake in the Reserve, from the harms associated with oil and gas development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

8. Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993 with approximately 100,000 members, including many members in Alaska. AWL's mission is to lead the effort to preserve Alaska's wild lands and waters by engaging citizens and decision makers with a courageous, constant, victorious voice for Alaska. AWL advocates for the protection of Alaska's wild lands and waters and works to prevent environmental degradation on Alaska's public lands and waters, including the Reserve. AWL actively works on issues

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                             Page 3 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 3 of 19

related to oil and gas development and the protection of Special Areas and values in the Reserve. AWL also operates an environmental justice program that works closely with communities in the Arctic impacted by development. AWL is committed to honoring the human rights and traditional values of the people of the Arctic.

9. Plaintiff Defenders of Wildlife (Defenders) is a nonprofit organization founded in 1947 with approximately 1.2 million members and supporters, including over 5,000 in Alaska. Defenders has offices across the country, including Anchorage. Its mission is to protect all native animals and plants in their natural communities. Defenders works to protect and restore key species and their habitats throughout North America through education, advocacy, litigation, and other efforts. It advocates for the sound management of our public lands and wildlife, including the Reserve. Defenders has actively worked to promote wildlife habitat conservation and public land management in Alaska, including in the Arctic. Defenders serves on the U.S. Fish and Wildlife Service's Polar Bear Recovery Advisory Work Group on Reducing Human-Polar Bear Conflicts, and works to reduce any conflicts or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Reserve and elsewhere in the Arctic.

10. Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 835,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,900 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including the Reserve. Sierra Club members use the public lands in the Arctic and Reserve for quiet recreation, aesthetic pursuits,

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                                                 Page 4 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 4 of 19

and spiritual renewal. These areas would be threatened by increased oil and gas development that could result from the proposed lease sale.

11. Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a six-person staff in Alaska. Its overall mission is to protect wilderness and inspire Americans to care for wild places. The Wilderness Society has close to a million members and supporters, many of whom are in Alaska. The goal of its Alaska program is to permanently protect special places in America's Arctic and sub-Arctic, including in the Reserve. The Wilderness Society has been engaged in Reserve conservation efforts for decades, and has consistently participated in public processes associated with Reserve land use decisions. Staff have visited the Northeast region of the Reserve on numerous occasions to assess conservation values and to conduct scientific research. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape to complete their life cycles.

12. The groups' members and supporters work, visit, and recreate in and around the Reserve, including those lands and waters in and near the lease sale area, and plan to return to the lease sale area. Groups' members and supporters also live in and around the Reserve. Groups' members and supporters use the lease sale area and depend on the health of the subsistence resources in the lease sale area and its vicinity to support their subsistence way of life. The groups' members and supporters have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Reserve and in the lease sale area, and they enjoy or use wildlife that inhabit these areas.

13. These interests, and the members' and supporters' use and enjoyment of the areas, have been, are being, and will continue to be adversely affected by oil and gas activities in the Reserve. The oil and gas activities allowed by the lease sale will potentially degrade and harm

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG    Page 5 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 5 of 19

wildlife and habitat, thereby harming the interests of groups' members and supporters. Oil and gas activities enabled by the lease sale will also impede members' ability to access subsistence resources in the region. The lease sale and future development it enables will adversely affect the natural environment and wildlife used and enjoyed by the groups' members and supporters and harm the interests of the groups' members and supporters.

14. BLM's issuance of leases in violation of NEPA threatens imminent, irreparable harm to the interests of the groups and their members. These actual, concrete injuries suffered by the groups and their members and supporters are fairly traceable to oil and gas development in the region and BLM's lease sale, and would be redressed by the relief sought in this case.

Defendants

15. Defendant U.S. Department of the Interior is an agency of the United States responsible for oversight of BLM.

16. Defendant BLM is an agency within the U.S. Department of the Interior and is responsible for managing federal lands and the subsurface mineral estate underlying federal lands in the Reserve. BLM is responsible for implementing and complying with federal law, including the federal laws related to the lease sale challenged in this action.

17. Defendant Ryan Zinke is the Secretary of the Interior and is being sued in his official capacity. Secretary Zinke is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM comply with all applicable laws and regulations.

18. Defendant Brian Steed is the official who is exercising the authority of the Director of BLM and is being sued in his official capacity. Mr. Steed is responsible for the supervision and management of all decisions, operations, and activities of BLM.

## IV. STATUTORY AND REGULATORY BACKGROUND

19. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG    Page 6 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 6 of 19

environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 40 C.F.R. § 1502.1. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

20. NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

21. NEPA requires federal agencies to include alternatives to the proposed action within an EIS. 42 U.S.C. § 4332(2)(C). The alternatives analysis is the "heart" of a NEPA document, and NEPA's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives," including appropriate mitigation measures to reduce the potential impacts of the action on the environment. 40 C.F.R. § 1502.14.

22. NEPA also requires that an EIS analyze the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.7. An agency must prepare an EIS for any action that has "individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                           Page 7 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 7 of 19

result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

23. When a federal agency is not certain whether an EIS is required, it must prepare an EA. If the EA concludes that the proposed action will not have significant impacts on the environment, the agency may issue a Finding of No Significant Impact (FONSI) and proceed with the proposed action. The EA must take a hard look at the impacts, and if the agency decides the impacts are not significant, it must supply a convincing statement of reasons why that is the case. If, on the other hand, the agency concludes there is a possibility that its action may directly or indirectly cause a significant impact, then it must prepare an EIS. *See* 40 C.F.R. §§ 1501.3–.4, 1508.9.

24. NEPA requires that agencies evaluate the environmental consequences of a project, beginning at an early stage of the planning process. Agencies can prepare a high-level programmatic EIS with sufficient detail to foster informed decision-making, and to defer the in-depth evaluation of the site-specific impacts until a critical decision has been proposed to act on site development.

25. An agency makes the critical decision to act on site development when it proposes to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site.

26. If the agency proposes to make an irreversible and irretrievable commitment of resources, prior programmatic statements are no longer enough; the agency must conduct a site-specific analysis of the impacts of the proposed action.

27. If an agency proposes to make an irreversible and irretrievable commitment of resources, an agency cannot defer the analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time when there is a specific proposal made or application submitted.

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                                                                          Page 8 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 8 of 19

28. The Naval Petroleum Reserves Production Act of 1976 (NPRPA) governs BLM's management of the surface values and subsurface resources in the Reserve. 42 U.S.C. §§ 6501–6508. The Reserve-specific regulations BLM adopted pursuant to the NPRPA require BLM to complete its environmental analysis under NEPA prior to selecting and offering lease tracts for sale. 43 C.F.R. § 3131.2.

## V. FACTS

29. At approximately 22.8 million acres — an area roughly the size of Indiana — the Reserve is the largest single public land unit in the country. The Reserve provides rich habitat for caribou, grizzly and polar bears, wolves, and a range of migratory birds and waterfowl. It is also home to the Western Arctic and Teshekpuk Lake Caribou Herds, which provide a key subsistence resource to numerous communities in the Reserve and across northwest Alaska.

30. President Warren G. Harding originally set aside the Reserve in 1923 as a petroleum reserve for the U.S. Navy. In 1976, it was re-designated and Congress passed a new law recognizing the exceptional ecological values in the Reserve. The new law instructed the Secretary of the Interior to designate any areas containing significant subsistence, recreational, fish and wildlife, or historical or scenic values. 42 U.S.C. § 6504(a). Based on this authority, the Secretary designated multiple Special Areas — including the Teshekpuk Lake and Colville River Special Areas — to ensure "maximum protection" of the environment, fish and wildlife, and historical or scenic values.

31. Teshekpuk Lake is one of the most productive wetland complexes in the Arctic and provides vital nesting habitat for hundreds of thousands of migratory birds. The Teshekpuk Lake area, along with the neighboring Smith Bay marine habitat, supports the highest density of shorebirds in the circumpolar Arctic, including threatened spectacled eiders, Steller's eiders, yellow-billed loons, dunlins, and American golden-plovers. As many as 35,000 greater white-

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                                                                          Page 9 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 9 of 19

fronted geese and 37,000 brant molt in the area, as do thousands of Canada geese and Snow geese. This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd.

32. The Colville River Delta is the largest and most ecologically rich river delta in northern Alaska. The cliffs along the Colville River provide critical nesting sites and adjacent hunting areas for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

33. BLM adopted the first-ever comprehensive management plan covering the entire Reserve in 2013. This plan, called the Integrated Activity Plan (IAP), set out broad decisions for how BLM would manage resources and the values in the Reserve. As part of the process for adopting the management plan, BLM prepared an EIS pursuant to NEPA to look at various management and land-allocation alternatives for the Reserve. In issuing the Record of Decision (ROD) for the IAP, BLM adopted Alternative B-2. Although Alternative B-2 protected many of the wildlife, habitat, and subsistence values of the Reserve, it also made approximately 11.8-million acres of the Reserve available for oil and gas leasing and development. Alternative B-2 also incorporated stipulations and best management practices applicable to oil and gas and other activities in the Reserve.

34. The IAP expanded the Teshekpuk Lake Special Area from 1.75-million acres to 3.65-million acres. The IAP closed approximately 3.1 million acres of the Teshekpuk Lake Special Area to oil and gas leasing because of the area's importance to subsistence users and wildlife, including the Teshekpuk Lake Caribou Herd.

35. The IAP left the Colville River Special Area open to oil and gas leasing and other activities.

36. Oil and gas exploration, development, and production activities typically include seismic exploration, exploratory drilling, production pads, pipelines, roads, and gravel pits to support the development of such infrastructure, and involve substantial amounts of industrial activity. Oil and gas activities and infrastructure can have significant impacts on Arctic wildlife,

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG    Page 10 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 10 of 19

particularly to caribou and nesting bird populations. Development and roads can also negatively impact subsistence use and other activities. These impacts extend well beyond the footprint of the actual development.

37. When analyzing the impacts of the leasing program and other activities in the IAP EIS, BLM examined a hypothetical development scenario and hypothetical layouts for oil and gas facilities as a method to estimate potential impacts to surface resources at the programmatic level. These hypothetical development designs included the likely infrastructure — such as drill pads, airstrips, processing facilities, and pipelines — for various types of developments that might occur broadly in the Reserve. For areas outside of the then-existing oil and gas units, BLM's hypothetical development scenario did not propose or consider specific areas where development of unknown resources might take place or evaluate the site-specific impacts of development occurring in specific areas.

38. BLM also analyzed the potential impacts of the IAP decision on subsistence at the programmatic level. Setting aside the potential cumulative impacts from development in and outside of the Reserve, BLM concluded there would be no significant restrictions to subsistence uses in the Reserve. According to BLM, any impacts would remain localized and would not significantly affect subsistence species, access to subsistence species, or subsistence use. BLM determined that the IAP contained adequate stipulations and best management practices to ensure that significant restrictions to subsistence uses and needs would not occur.

39. In 2015, BLM approved ConocoPhillips Alaska, Inc.'s (ConocoPhillips) drilling permit for the Greater Mooses Tooth 1 (GMT-1) development. The project included a drilling pad and 7.6-mile road that would extend ConocoPhillips' existing oil and gas infrastructure at Alpine and Colville Delta-5 further west into the Reserve. In making the decision, BLM waived a protective provision in the IAP that would have kept oil and gas infrastructure out of an

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                                                                      Page 11 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 11 of 19

established buffer around Fish Creek, an important subsistence use area for the community of Nuiqsut.

40. In its GMT-1 decision, BLM recognized that there would be significant impacts to subsistence users and other values from the project that could not be fully mitigated by the best management practices and stipulations in the IAP. To address those impacts, including major impacts to subsistence uses, BLM required additional compensatory mitigation funding of $8 million from ConocoPhillips. These funds were to be used to support BLM's development of a regional mitigation strategy (RMS) for the northeastern region of the Reserve and to finance compensatory mitigation projects to offset major impacts to subsistence uses.

41. BLM intended for the RMS to serve as a roadmap for mitigating impacts from both GMT-1 and future projects in the northeastern region of the Reserve. The RMS would also consider the foreseeable land uses, including oil and gas developments enabled by the existence of GMT-1, and the foreseeable impacts from those developments on the resources and values in the region, including socioeconomic impacts. The objectives of the RMS included maintaining functioning habitat to sustain abundant fish and wildlife populations and ensuring continued access to important subsistence use areas. The RMS might also identify additional opportunities for avoidance or additional protections for special areas. BLM issued a draft RMS but has yet to issue a final.

42. There have been a number of significant discoveries and other development activities since the adoption of the IAP that have the potential to significantly expand development activities and the cumulative impacts of development within and around the Reserve. Caelus Energy announced a substantial find in state waters off the coast of the Reserve in Smith Bay in 2016. In early 2017, ConocoPhillips announced a 300-million-barrel oil discovery at the Willow prospect in the northeastern part of the Reserve, which could double the amount of infrastructure and industrial activity in the northeast corner of the Reserve.

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG    Page 12 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 12 of 19

ConocoPhillips has indicated that it intends to bring Willow into production by 2023, expanding its existing developments and the associated impacts even further into the Reserve. Armstrong Energy, Inc. (Armstrong) also upgraded its resource estimates at the Nanushuk development to a billion-plus-barrel oil prospect in 2017. Nanushuk, which Armstrong touts as the largest onshore oil discovery in three decades, lies on state lands immediately adjacent to the Reserve and the community of Nuiqsut. Armstrong is already in the process of permitting its development plans for Nanushuk and estimates first production in 2021.

43. On May 31, 2017, Secretary of the Interior Zinke signed Secretarial Order 3352, which called for initiating a process to potentially reopen the IAP and open additional areas in the Reserve to oil and gas development. The Secretarial Order further directed BLM to evaluate how to maximize the number of tracts it offers during the next lease sale in the Reserve.

44. Secretarial Order 3352 also called for development of a plan to update the existing assessments of undiscovered and technically recoverable oil and natural gas resources on Alaska's North Slope, with a focus on federal lands in the Reserve. The U.S. Geological Survey's (USGS) 2010 resource assessment estimated the Reserve contained approximately 895 million barrels of economically recoverable oil and 52.8 trillion cubic feet of natural gas. However, the number of significant discoveries in and around the Reserve led USGS to rethink its previous resource estimates for the Reserve. USGS was in the process of updating its resource assessment during the lease sale proceedings, and issued an updated assessment eight days after the lease sale took place.

45. Since the adoption of the IAP, BLM has conducted lease sales every year in the Reserve. At the 2016 lease sale, companies bid on 67 tracts, for a combined total of 613,528 acres. The 2016 lease sale nearly doubled the existing leased acreage in the Reserve, which was roughly 895,000 acres. Sixty-five of the tracts were in an area extending south and west from ConocoPhillips' existing Bear Tooth and Mooses Tooth Units and related oil developments, and

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                    Page 13 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 13 of 19

included a substantial number of acres within the boundaries of the Teshekpuk Lake and Colville River Special Areas.

46. Prior to the 2017 lease sale, BLM solicited comments and nominations from industry and the public on which tracts to include in the lease sale. BLM called for comments on all tracts within the Reserve, including those closed to oil and gas development under the IAP.

47. Several environmental organizations, including NAEC, submitted comments urging BLM not to conduct any further leasing until after the completion of a site-specific environmental analysis to ensure BLM fully understood the impacts of development in the region. NAEC asserted that BLM was required to analyze the significant and foreseeable effects of oil and gas development in the region and to take a hard look at all the direct, indirect, and cumulative impacts of leasing additional areas in the Reserve. This included information about new discoveries and developments in the region and the potential contribution to climate change. NAEC also asked BLM not to conduct any further leasing in the northeast area of the Reserve until after completion of the RMS to ensure there were adequate protections and mitigation measures in place to protect important ecological and subsistence resources, and to ensure BLM fully understood the potential cumulative and other impacts of development.

48. After the comment period, BLM issued a Detailed Statement of the Sale, where the agency identified the specific tracts it would offer in the lease sale. BLM offered 900 tracts, covering approximately 10.3 million acres. This was the largest number of tracts ever offered for an oil and gas lease sale in the Reserve, and consisted of all the tracts designated as available for leasing under the IAP.

49. Prior to the lease sale, BLM prepared a Determination of NEPA Adequacy that relied on the NEPA analysis for the IAP and the Colville River Special Area Management Plan. The Determination of NEPA Adequacy was not available for public comment. In determining that BLM did not need to conduct any additional environmental analysis under NEPA, BLM

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                    Page 14 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 14 of 19

provided conclusory statements that the existing analysis was adequate and there was no new information that would change the analysis for the lease sale. BLM also stated that the direct, indirect, and cumulative impacts were similar and essentially unchanged from those considered in the IAP.

50. At the 2017 lease sale, ConocoPhillips and its partner Anadarko acquired seven tracts totaling approximately 80,000 acres.

51. Under the terms of the leases, BLM granted the exclusive right to drill and produce the oil and gas resources in the leased areas, along with the right to build and maintain necessary infrastructure. The terms provide some level of authority for BLM to require mitigation on the parcels when not inconsistent with the rights granted in the lease, but the leases do not contain a provision expressly allowing BLM to deny future development proposals.

52. ConocoPhillips Alaska, Inc. signed the leases on February 1, 2018; Anadarko signed the leases on February 5, 2018.

53. BLM signed the leases on February 22 and issued a decision on the leases on February 23, 2018. After conducting the lease sale, BLM issued a revised DNA that discussed the updated USGS assessment of resources in the Reserve, significant oil discoveries and developments in the region, the 2016 lease sale, and the GMT-1 decision.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of NEPA; Failure to Prepare an EA or EIS)

54. NAEC re-alleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

55. NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. Pursuant to NEPA, agencies must take a "hard look" at the consequences,

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG           Page 15 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 15 of 19

environmental impacts, and adverse effects of their proposed actions, consider alternatives to the proposed action, and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, .14, .16, 1508.7.

56. The BLM lease sale is a major federal action significantly affecting the quality of the human environment.

57. An agency must consider the site-specific impacts of a proposed action prior to making an irreversible and irretrievable commitment of resources.

58. When it issued the leases, BLM made an irretrievable and irreversible commitment of resources.

59. BLM violated NEPA by holding the lease sale and making an irretrievable and irreversible commitment of resources without first preparing an EIS or EA.

60. For each of the above reasons, and others, BLM's sale of the oil and gas leases without preparing an EIS or EA was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT II
**(Violation of NEPA; Failure to Assess the Direct, Indirect, and Cumulative Impacts)**

61. NAEC re-alleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

62. NEPA requires federal agencies, including BLM, to take a "hard look" in an EIS at the consequences of a proposed major federal action. 42 U.S.C. § 4332(C)(i). NEPA requires that an EIS include an assessment of the cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. 40 C.F.R. § 1508.7.

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                      Page 16 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 16 of 19

63. BLM failed to take a hard look at the potential direct, indirect, and cumulative impacts of the 2017 lease sale. BLM failed to conduct an adequate assessment of the environmental impacts of all past, present, and reasonably foreseeable activities on subsistence, wildlife, and other resources in and around the Reserve.

64. BLM failed to take a hard look at new information that has become available since the adoption of the IAP or to provide a convincing statement of reasons as to why it was not required to prepare an EA or EIS in light of that new information.

65. BLM failed to take a hard look at the impacts from the significant number of new developments and discoveries in and around the Reserve, including the roughly doubling of the leased acreage in the Reserve in the 2016 lease sale.

66. BLM also failed to take a hard look at the potential direct, indirect, and cumulative impacts to subsistence and the need for additional mitigation measures, despite the fact that BLM found there were major impacts to subsistence from the GMT-1 decision and was in the process of developing a mitigation plan for the northeast region of the Reserve to better address those and future impacts of development.

67. BLM's decision to hold the 2017 lease sale without first conducting an adequate assessment of the direct, indirect, and cumulative impacts was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT III
**(Violation of the NPRPA; Failure to Comply with NEPA Prior to Conducting the Lease Sale)**

68. NAEC re-alleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                      Page 17 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 17 of 19

69. BLM's regulations for lease sales in the Reserve, adopted pursuant to the NPRPA, require BLM to conduct the necessary environmental analysis under NEPA prior to selecting tracts to offer in a lease sale. 43 C.F.R. § 3131.2(b).

70. BLM violated this regulation by issuing a revised DNA after it had already conducted the 2017 lease sale.

71. BLM's decision to hold the 2017 lease sale without first complying with its obligations under NEPA was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by the NPRPA and its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

NAEC respectfully requests that this Court grant the following relief:

1. Declare that BLM violated NEPA, the APA, and the NPRPA, and that the actions as set forth above are arbitrary, capricious, and not in accordance with law;

2. Vacate and set aside as unlawful the 2017 lease sale, the underlying Determinations of NEPA Adequacy, and any leases issued pursuant to such sale;

3. Enter appropriate injunctive relief;

4. Award NAEC all reasonable costs and fees as authorized by law; and

5. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 21st day of May, 2018,

    s/ Suzanne Bostrom
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG     Page 18 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 18 of 19

## CERTIFICATE OF SERVICE

      I certify that on May 21, 2018, I caused a copy of Plaintiffs' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system, which will send electronic notification of such filings to the attorneys of record in this case whom are registered with the CM/ECF system.

                                                    s/Suzanne Bostrom
                                                   Suzanne Bostrom

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr. et al. v. U.S. Dep't of the Interior et al.*
Case No. 3:18-cv-00030-SLG                                                                                       Page 19 of 19

Case 3:18-cv-00030-SLG   Document 32   Filed 05/21/18   Page 19 of 19